UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**
JUN - 1 2016


| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES WADE HENRY, SR.,<br><br>Defendant. | 3:15-CR-30119-RAL<br><br>REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS STATEMENTS AND EVIDENCE |

Law enforcement received a report that James Wade Henry, Sr. sexually abused his 3-year-old daughter while sleeping with her in a home on the Rosebud Indian Reservation. Federal and tribal agents interviewed him at his place of employment and he made statements to them which he now seeks to suppress. He also seeks to exclude evidence gleaned from a warrant-authorized search of his cell phone. Because the statements and evidence were lawfully obtained, the Court recommends that Henry's suppression motion be denied.

## BACKGROUND

On September 29, 2014, FBI Special Agent Alicia Rowland received a report from Social Services about child sexual abuse allegations involving Henry. The next day, the agent met with Amanda Brave, who had made the report, and obtained a statement as to what transpired the night of September 27-28, 2014.

That night, Brave stayed with Henry, her boyfriend, at his mother's home in St. Francis, South Dakota. Also present were Henry's two daughters, J.K.H. (age 3) and J.M.H. (age 6). All four of them slept together in Henry's bed. Brave put J.K.H. in a nightie type of outfit with a top that attached to shorts. J.K.H. asked to sleep next to Brave and laid down between Brave and Henry. J.M.H. bedded down on the opposite side of Henry.

Around midnight, Brave awoke to Henry moving J.K.H. to his other side, away from Brave, and next to J.M.H. Brave was now next to Henry, lying on his side with his back toward her. J.K.H. was lying on her back with her right leg over Henry's hip. Brave saw Henry spit into and put his hand down near J.K.H.'s genital area. Brave then sat up and observed Henry rubbing the child's vagina, in a circular motion, under her shorts.

Not knowing exactly what to do, Brave got out of the bed, took Henry's cell phone into the bathroom and called her cousin, Shana Schmidt. Brave informed Schmidt that she had just seen Henry sexually touching his 3-year-old daughter. Schmidt told Brave she should get out of the house. Brave went back to the bedroom, gathered her belongings, and left in Henry's car with his cell phone. She drove the car until it ran out of gas at the White River junction. There, she called Schmidt on Henry's phone and Schmidt came and picked Brave up.

Brave still had Henry's cell phone when she met with Agent Rowland. Brave knew his password and had looked at photos on the phone. They included pictures of

2

J.K.H. and J.M.H. in their underwear. One of the photos was of J.K.H. lying on a fold-out bed with her head turned away from the camera. Agent Rowland took possession of the phone, which had been turned off, but did not power it up or otherwise browse through its data.

On September 30, 2014, Agent Rowland and Mark Kettell, a special agent with the Rosebud Sioux Tribe Law Enforcement Services, drove to the TECRO office building in Rosebud, South Dakota, where Henry worked, to interview him. Henry invited the agents back to his office and talked to them for less than 40 minutes. Most (about 37 minutes), but not all, of the interview was tape recorded. Before turning the recorder on, Agent Rowland advised Henry that he was not under arrest and that the interview was voluntary. Henry agreed to speak with the agents, denied over and over that he ever touched J.K.H. in a sexual way and requested a polygraph examination. He also maintained that Brave had concocted a story to get back at him and that the photos on his phone were taken by J.M.H. and not him. When the interview was over, the agents left together and did not arrest Henry.

More than a year later, Henry was indicted and arrested for aggravated sexual abuse and abusive sexual contact of J.K.H. After pleading not guilty to both offenses, he filed a motion to suppress the statements he made to Agents Rowland and Kettell and the evidence obtained from his cell phone. A hearing was held on the motion at which the agents testified and 12 exhibits were received into evidence, including an audio recording of Henry's interview.

## DISCUSSION

### A. Statements

#### 1. Custody

Henry initially claims that his statements to Agents Rowland and Kettell, on September 30, should be suppressed because he was never advised of his *Miranda* rights. *Miranda* requires that law enforcement officers provide certain warnings before they conduct an interrogation of a suspect who is in custody.[1] Henry contends that he was in custody when the agents questioned him about sexually abusing his daughters and that he should have been Mirandized before they did.

"Custody" is a "term of art" that describes circumstances generally thought "to present a serious danger of coercion."[2] The initial step in determining whether a person is in custody is to ascertain whether, in light of "the objective circumstances of the interrogation,"[3] a "reasonable person [would] have felt he [ ] was not at liberty to terminate the interrogation and leave."[4] When gauging the person's freedom of movement, a court must examine "all of the circumstances surrounding the

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

[2] *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012).

[3] *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (*per curiam*).

[4] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2012) (*quoting Thompson* and emphasizing that the custody determination has "[t]wo discrete inquiries").

4

interrogation."[5] Pertinent factors include being informed that he is or is not under arrest,[6] "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning and the release of [him] at the end of the questioning."[7]

Before being questioned, Agent Rowland informed Henry that he was not under arrest and that the interview was voluntary. These admonitions have long been regarded as weighty in the custody analysis. And the Eighth Circuit Court of Appeals has "never held that a [suspect] was in custody after receiving them."[8] "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for [agents] to inform the [suspect] that an arrest is not being made and that [he] may terminate the interview at will."[9] Advising the suspect that he is not under arrest, and that his participation in questioning is voluntary "is highly probative

---

[5]*Stansbury*, 511 U.S. at 322, 325.

[6]*See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977); *United States v. Griffin*, 922 F.2d 1343, 1349-50 (8th Cir. 1990); *see also California v Beheler*, 463 U.S. 1121, 1122, 1125 (1983) (*per curiam*) (noting that "the police specifically told [the suspect] that he was not under arrest" and this was a factor in the custody determination).

[7]*Howes*, 132 S.Ct. at 1189.

[8]*United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (*quoting United States v. Perrin*, 659 F.3d 718, 721 (8th Cir. 2011)).

[9]*Williams*, 760 F.3d at 814 (*quoting Griffin*, 922 F.2d at 1349).

of whether a reasonable person would feel that he may terminate the interview and leave."[10]

Henry was questioned in a room he selected in the building where he worked. This location was one he was familiar with and was not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation. And it certainly would have softened the hard aspects of the agents' interrogation and moderated his sense of being held in custody.[11]

At no time was Henry deprived of his freedom of movement to the degree associated with a formal arrest. He was never handcuffed, physically restrained or otherwise confined.[12] Significantly, when the interview ended, he was not arrested, and the agents departed on their own, leaving him to do whatever he wanted.[13]

The fact that Henry was outnumbered and questioned in a closed room did not make the atmosphere police dominated. The interview was relatively short – lasting just under 40 minutes – and was conducted primarily by one agent. The agents were visitors to his work place and never took control of the site or any other persons there.

---

[10]*United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 544 U.S. 1060 (2005)

[11]*See United States v. Laurita*, No. 15-1137, 2016 WL 2342965 at *6 (8th Cir. May 4, 2016); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003).

[12]*See Laurita*, 2016 WL 2342965 at *4; *Wallace*, 323 F.3d at 1113.

[13]*See Laurita*, 2016 WL 2342965 at *7; *Williams*, 760 F.3d at 815.

Henry acquiesced to the agents' request for an interview and responded to their questions without hesitation and, at times, in a steadfast manner. The context of and the statements made during the interview do not show that it was "custodial," within the meaning of *Miranda*.[14]

Any strong-arm tactics or deceptive stratagems Agent Rowland may have used did not result in or serve to transform the interview into a custodial one. Letting Henry know that he could face additional charges for lying to a federal officer and lose J.K.H. and J.M.H. and falsely informing him that his daughters had disclosed sexual abuse, although perhaps coercive, are largely irrelevant to the custody determination. This is because a reasonable person in Henry's shoes would not have perceived these statements as restricting his ability to terminate the interview and leave.[15] Whatever relevance the agents' statements may have had to other issues in the case, the statements had nothing to do with whether Henry was in custody for purposes of the *Miranda* rule.[16]

Having studied the scene and reconstructed the events surrounding the interview, the Court is convinced a reasonable person in Henry's position would not

---

[14]*See Laurita*, 2016 WL 2342965 at *6; *Wallace*, 323 F.3d at 1113.

[15]*See Laurita*, 2016 WL 2342965 at *5; *United States v. Aldridge*, 664 F.3d 705, 712 (8th Cir. 2011); *Czichray*, 378 F.3d at 829-30; *United States v. LeBrun*, 363 F.3d 715, 720-21 (8th Cir. 2004) (*en banc*), *cert. denied*, 543 U.S. 1145 (2005).

[16]*See Mathiason*, 429 U.S. at 495-96; *United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir.), *cert. denied*, 556 U.S. 1288 (2007); *LeBrun*, 363 F.3d at 721-22.

have understood he was in custody while briefly conversing with Agents Rowland and Kettel at his job site. The agents, thus, were not required to warn him of his Fifth Amendment privilege against self-incrimination and his right to the assistance of counsel, under *Miranda*, before communicating with him. Inasmuch as the precepts of *Miranda* were adhered to, Henry's attempt to suppress his statements on custody grounds must fail.

2. **Voluntariness**

Henry also argues that the statements he made on September 30 were involuntary. He maintains that his statements were the product of undue influence based on the manner in which he was interrogated and Agent Rowland's statements and misconduct.

The Due Process Clause of the Fifth Amendment "does not mandate that [agents] forego all questioning, or that they be given cart blanche to extract what they can from a suspect."[17] The test is one of voluntariness: Were the statements "the product of an essentially free and unconstrained choice by [their] maker?"[18] If so, the suspect has "willed [himself] to confess," or at least agreed to uninhibitedly speak with agents, and his statements may be used against him.[19] If not, "the use of his [statements] offends

---

[17] *Schneckloth v. Bustamante*, 412 U.S. 218, 225 (1973).

[18] *Id.*

[19] *Id.*

Case 3:15-cr-30119-RAL Document 51 Filed 06/01/16 Page 9 of 17 PageID #: 355

due process."[20] The dispositive question, in terms of voluntariness, is whether the statements were obtained by "threats, violence, or express or implied promises sufficient to overbear the [suspect's] will and critically impair his capacity for self-determination."[21] When deciding this question, a court must look to the totality of the circumstances, including the "conduct of [agents] and the characteristics of the [suspect].[22]

There is no proof – worthy of belief – that Henry, who was a 38-year-old high school graduate at the time, was coerced into making any statements against his will. He agreed to speak with Agents Rowland and Kettel, escorted them to his office and closed the door to it. There he was advised of the nature and purpose of the interview and that it was voluntary. At no time did the agents ever make any physical threats or promises to Henry or even touch him. The duration, tone and overall atmosphere of the interview were not hostile or intimidating. While with the agents, Henry was not under the influence of alcohol or drugs and nothing he said or did indicated that he suffered from any kind of cognitive impairment.

---

[20]*Id.* at 225-26.

[21]*LeBrun*, 363 F.3d at 724.

[22]*Id.*

9

It is true that Agent Rowland used deception and other techniques to elicit inculpatory admissions from Henry. But the techniques she employed had little or no intrinsic effect on him.[23] Notably, he:

1. denied engaging in any sex acts with his daughters, repeatedly proclaiming that he did not touch or molest them;

2. remarked that Brave made up the sexual abuse story (involving he and J.K.H.) to get back at him because he told her he no longer wanted to be in a relationship with her and because he had reported his vehicle and cell phone (which she had) stolen to tribal authorities; and

3. said the cell phone photos of his daughters, in their underwear, were taken by J.M.H.

Statements like these are more indicative of a suspect trying to get himself out of a jam and save his own skin than one whose free will has been broken and who, as a result, is incapable of yielding to the compulsion of his interrogator.

At any rate, agents frequently use a variety of tactics when conducting interviews, including claiming not to believe a suspect's explanations, playing on the suspect's emotions, using the suspect's request for his family against him, deceiving the suspect and conveying sympathy.[24] None of these tactics, however, render a confession

---

[23]*See United States v. Brave Hawk*, 3:15-CR-30090-RAL, 2016 WL 311263 at **3-4 (D.S.D. Jan. 26, 2016); *United States v. Fast Horse*, No. 12-CR-30034-RAL, slip op. at 6 (D.S.D. July 24, 2012).

[24]*See United States v. Sanchez*, 614 F.3d 876, 884 (8th Cir. 2010); *United States v. Braveheart*, 397 F.3d 1035, 1041 (8th Cir. 2005); *United States v. Astello*, 241 F.3d 965, 967-68 (8th Cir.), *cert. denied*, 533 U.S. 962 (2001); *Jenner v. Smith*, 982 F.2d 329, 334 (8th Cir.), *cert. denied*, 510 U.S. 822 (1993).

involuntary unless "the overall impact of the interrogation caused [the suspect's] will to be overborne."[25] That certainly did not happen with Henry. He was able to resist the pressure Agent Rowland exerted on him and defend against her accusations.

The record as a whole plainly shows that Henry's statements were voluntary. They were ones he wanted to make and were not the product of any coercive environment and questioning that overwhelmed his faculties and acutely disabled his ability to fend off the urge to confess.[26] This being the case, the statements may be used against him as substantive evidence at trial.

## B. Cell Phone Evidence

Henry lastly contends that the evidence seized from his cell phone should be excluded under the Fourth Amendment. He says that the search of his phone was

---

[25]*United States v. Boslau*, 632 F.3d 422, 428-29 (8th Cir. 2011); *United States v. Martin*, 369 F.3d 1046, 1055 (8th Cir. 2004); *LeBrun*, 363 F.3d at 725-26; *see also Aldridge*, 664 F.3d at 713 (police-dominated atmosphere and use of deceptive interview tactics not enough to show that defendant's statement was involuntary).

[26]*See Frazier v. Cupp*, 394 U.S. 731, 739 (1969); *Aldridge*, 664 F.3d at 713; *Sanchez*, 614 F.3d at 884-88; *Braveheart*, 397 F.3d at 1041; *LeBrun*, 363 F.3d at 726-27; *United States v. Petary*, 857 F.2d 458, 460-61 (8th Cir. 1988); *see also United States v. Williams*, 793 F.3d 957, 963 (8th Cir. 2015) (the polestar in deciding whether statements are voluntary always must be whether or not authorities overbore suspect's will and critically impaired his capacity for self-determination; it is not enough to show authorities' representations were the but-for cause of suspect's confession); *Brave Hawk*, 2016 WL 311263 at *2 (officer's use of deception did not transform the interview into a coercive situation that was sufficient to overbear defendant's will; the deception had essentially no effect on defendant and he continued to maintain his innocence and even agreed to a polygraph, saying that he knew he would pass); *United States v. Poorman*, CR. 3:14-CR-30101-RAL, 2015 WL 788050 at **4-5 (D.S.D. Feb. 24, 2015) (agent's deception did not overbear defendant's will and piercingly impair his decision-making capacity).

11

illegal and that the search warrant affidavit was invalid because the affidavit contained false statements in it which, when excised, resulted in the lack of probable cause to issue a warrant for the phone. He asserts that because of this, he is entitled, under *Franks v. Delaware*,[27] to a hearing and ultimately to the entry of an order voiding the search warrant and suppressing all evidence seized pursuant to it. But he has failed to make the necessary showing, either initially or on the merits, to justify granting him any *Franks* relief whatsoever.

Where a probable cause determination is premised on an affidavit containing false statements, the resulting search warrant may be invalid if the defendant can establish, by a preponderance of the evidence, that (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, included false statements in the affidavit and (2) without the false statements, the affidavit would not have established probable cause.[28]

To be entitled to a *Franks* hearing, a "substantial preliminary showing" that includes allegations of deliberate falsehood or reckless disregard for the truth must be made. These allegations must be accompanied by an offer of proof.[29] They should

---

[27]438 U.S. 154 (1978).

[28]*See Franks*, 438 U.S. at 155-56; *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008); *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir.), *cert. denied*, 554 U.S. 908 (2008).

[29]*See Franks*, 438 U.S. at 171; *United States v. El-Alamin*, 574 F.3d 915, 925 (8th Cir. 2009).

point out specifically what portion of the warrant affidavit is false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of the witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. Deliberate falsity or reckless disregard must be shown.[30] The test for reckless disregard is "whether, after viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of [her] statements or had obvious reasons to doubt the accuracy of the information she reported."[31]

There is a "presumption of validity with respect to the affidavit supporting the search warrant[.] [T]o mandate an evidentiary hearing [the defendant's] attack must be more than conclusory and must be supported by more than a mere desire to cross-examine."[32] And "[t]he substantiality requirement [needed for such a hearing] is not lightly met."[33] Indeed, a finding by a reviewing court that the affiant "may" have intentionally or recklessly included a false statement in the warrant affidavit is legally insufficient to necessitate a *Franks* hearing absent a determination that the included

---

[30]*See Franks*, 438 U.S. at 171; *United States v. Williams*, 477 F.3d 544, 557 (8th Cir. 2007); *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir.), *cert. denied*, 481 U.S. 1040 (1987).

[31]*United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011), *cert. denied*, 132 S.Ct. 1614 (2012); *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010).

[32]*Franks*, 438 U.S. at 171; *Williams*, 477 F.3d at 558.

[33]*United States v. Mashek*, 606 F.3d 922, 928 (8th Cir. 2010), *cert. denied*, 562 U.S. 1274 (2011); *Williams*, 477 F.3d at 558.

information may, in turn, have rendered the affidavit misleading or otherwise made a probable cause finding unsupportable.[34]

Here, the alleged false statements do not meet the substantial preliminary showing required by *Franks*.[35] Henry's contentions revolve around a single word – "inappropriate" – mentioned in two non-consecutive sentences in the same paragraph of the search warrant affidavit. He alleges that because Brave never used this word in her September 30 interview with Agent Rowland, the statements are false and indelibly taint the entirety of the affidavit and probable cause showing.

But when Agent Rowland contacted Brave again, just before preparing the search warrant affidavit, Brave used the characterizing adjective "inappropriate" in describing the photos of Henry's children lying in bed clad only in their underwear. The agent testified about this at the hearing[36] and her testimony was credible.[37] So the statements in the affidavit, containing the descriptive term "inappropriate," were not false at all, but rather, completely accurate. And the term, when considered in context, is synonymous with the word "creepy," the adjective Brave originally used when referring to the photos.

---

[34]*See Snyder*, 511 F.3d at 817; *Williams*, 477 F.3d at 558.

[35]*See McIntyre*, 646 F.3d at 1114.

[36]*See* Mot. Hrg. Tr. 22-24, 35-36, 47 (May 17, 2015)

[37]*See United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010).

14

Regardless, omitting the term "inappropriate" from the search warrant affidavit would not change the meaning or overall thrust of the paragraph in question, the affidavit as a whole or otherwise make the affidavit intentionally or recklessly misleading.[38] And more importantly, the affidavit, with this term redacted out, would have still been rich with evidence sufficient to establish probable cause for the issuance of a warrant to search the cell phone.[39]

Henry has failed to make the requisite "substantial preliminary showing" for a *Franks* hearing. There are no facts or words that were misstated, much less proof by a preponderance of the evidence, that the alleged false statements were made knowingly, intentionally or with reckless disregard for the truth. Nor has there been any showing that these statements were necessary to the finding of probable cause. *Franks* thus provides him with no traction or ground for relief under the Fourth Amendment.[40]

## CONCLUSION

Agents Rowland and Kettel did not violate the dictates of *Miranda* or Henry's Fifth Amendment rights so as to require the suppression of his statements. He willingly

---

[38]*See United States v. Kattaria*, 553 F.3d 1171, 1177 (8th Cir.) (*per curiam*) (*en banc*), *cert. denied*, 558 U.S. 1061 (2009).

[39]*See United States v. Arnold*, 725 F.3d 896, 899 (8th Cir. 2013); *United States v. Rivera*, 410 F.3d 998, 1002 (8th Cir. 2005).

[40]*See id.; Kattaria*, 553 F.3d at 1177; *United States v. Engler*, 521 F.3d 965, 969-70 (8th Cir. 2008); *United States v. Carpenter*, 422 F.3d 738, 745 (8th Cir. 2005), *cert. denied*, 546 U.S. 1128 (2006).

15

participated in an interview with the agents and spoke to them about allegations of sexual abuse. His *Miranda* and constitutional rights were adhered to and his statements to the agents were voluntary. No basis exists to exclude the statements.

Probable cause existed for the search of Henry's cell phone and the seizure of evidence (including photos of his daughters) from it. Agent Rowland's search warrant affidavit did not contain falsehoods that were either deliberately or recklessly made or that negated the sufficiency of her affidavit's probable cause showing. The search and seizure of his phone was therefore lawful and in accord with Fourth Amendment strictures.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Henry's Motion to Suppress Statements and Evidence[41] be denied *in toto*.

---

[41] *See* Dkt. No. 28.

## NOTICE

By mutual consent, the parties have agreed to shorten the period for filing objections to this report and recommendation from 14 to 7 calendar days.[42] Objections thus will be due on or before June 9, 2016.[43] Unless an extension of time for cause is obtained,[44] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[45] Objections must "identify[] those issues on which further review is desired[.]"[46]

DATED this 1st day of June, 2016.

BY THE COURT:

*/s/ Mark A. Moreno*

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[42]*See id.* at No. 48.

[43]*See* Fed. R. Crim. P. 59(b)(2).

[44]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[45]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[46]*Arn*, 474 U.S. at 155.