UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| UNITED STATES OF AMERICA, | 3:15-CR-30119-RAL |
|---|---|
| Plaintiff, | |
| | OPINION AND ORDER ADOPTING |
| vs. | REPORT AND RECOMMENDATION AND |
| | DENYING DEFENDANT'S MOTION TO |
| JAMES WADE HENRY, SR., | SUPPRESS |
| Defendant. | |

James Wade Henry, Sr. ("Henry") moved to suppress evidence obtained from Henry's cell phone and statements made by him to law enforcement on September 30, 2014. Docs. 28, 29. After an evidentiary hearing was held, Magistrate Judge Mark A. Moreno issued a Report and Recommendation, recommending that Henry's motion be denied in its entirety. Doc. 51 at 16. Henry has filed objections to that recommendation.[1] Doc. 53. This Court has conducted a de novo review of the record, and for the reasons explained below, this Court overrules Henry's objections and adopts Judge Moreno's Report and Recommendation.

**I. FACTS**

On September 29, 2014, FBI Special Agent Alicia Rowland ("Special Agent Rowland") was notified by a victim specialist that a report regarding allegations against Henry was made to

---

[1] Henry timely filed his objection within the stipulated and shortened time period of seven days. 28 U.S.C. § 636(b)(1); Doc. 48 at 2; Doc. 51 at 17; Doc. 53.

1

the Mission office of the South Dakota Department of Social Services ("DSS"). T. 8. Special Agent Rowland interviewed the DSS report complainant, Amanda Brave ("Brave"), the following day.[2] T. 9.

Brave told Special Agent Rowland that she had been dating Henry for approximately three or three-and-a-half months, and that Henry lives with his mother in St. Francis, South Dakota, with his two biological children, J.K.H. and J.M.H. Ex. 1 at 0:55; Ex. 5 at 2. In September of 2014, J.K.H. was three years old and J.M.H. was six years old.[3] Ex. 2 at 1:44, 18:55. Brave reported that she has stayed with Henry at his mother's house approximately two to four times a week during the last few months of their relationship. Ex. 1 at 3:04. When Brave would stay with Henry, she would sleep in his bedroom with Henry, J.K.H., and J.M.H, all in Henry's king-sized bed. Ex. 1 at 3:40; Ex. 5 at 2. Brave told Special Agent Rowland that both girls always sleep in underwear without a top on. Ex. 1 at 6:33; Ex. 5 at 2. Brave stated that they would normally sleep in the following order: Brave, Henry, and then both of the girls. Ex. 1 at 4:38; see also T. 11.

On the evening of Saturday, September 27, 2014, Brave put J.K.H. in a one-piece body outfit for bed that had "little short trunks." Ex. 1 at 9:50; Ex. 5 at 2; see also T. 11. That night, Brave was sleeping in Henry's bed in her normal spot by the wall. Ex. 1 at 7:23. J.K.H. came into the bedroom and said she was going to lay by Brave, and Brave responded that doing so was

---

[2] Special Agent Rowland audio recorded her interview with Brave on September 30, 2014. Ex. 1 (lasting approximately twenty-eight minutes).
[3] There is some inconsistency in the record regarding the age of Henry's children. See Ex. 1 at 1:34 (four and six), Ex. 2 at 1:44, 18:55 (three and six), Ex. 5 at 1 (three and five), Ex. 9 at 3, T. 10 (three and five or six). The ages Henry gave to Special Agent Rowland on September 30, 2014, ages three and six, are used here. Ex. 2 at 1:44, 18:55.

okay. Ex. 1 at 7:23; Ex. 5 at 3; see also T. 11–12. Later, James and J.M.H. came to bed and the four went to sleep in the following order: Brave, J.K.H., Henry, and then J.M.H. Ex. 1 at 4:53, 7:23, Ex. 5 at 3; see also T. 11–12. Brave then described how she woke up around midnight to Henry moving J.K.H. from the side closest to her to the other side of him. Ex. 1 at 8:00; see also T. 12. Brave reported that although Henry's bedroom doorway is covered with a blanket, the room was lit enough for her to see because the living room light was still on. Ex. 1 at 9:10; Ex. 5 at 3. Brave stated that Henry turned his back towards her after moving J.K.H. to his other side and that J.K.H. was lying on her back with her right leg over Henry's right hip. Ex. 1 at 8:00, 9:26, 10:47; see also T.12. According to Brave, she saw Henry put his hands up to his mouth, spit on his fingers, and then place his hands down toward J.K.H.'s private area, moving his right arm in a circular motion. Ex. 1 at 8:40, 11:18; Ex. 5 at 3; see also T. 12. Brave then sat up in bed and said that she saw Henry's hand was underneath J.K.H.'s clothing. Ex. 1 at 9:55, 11:40; see also T. 12. Brave reported that Henry pulled his hand away and acted like he was sleeping. Ex. 1 at 9:55, 11:40; see also T. 12. Brave got out of bed, went to the bathroom, and then asked Henry for his phone. Ex. 1 at 11:40; Ex. 5 at 3–4; see also T. 12–13. Henry gave Brave his cell phone and she called her cousin, Shawna Schmidt ("Schmidt"), to tell Schmidt what she saw and asked what she should do. Ex. 1 at 12:50. Schmidt told Brave to leave, so Brave grabbed her belongings and left, taking Henry's car and cell phone. Ex. 1 at 11:40, 12:50; Ex. 5 at 3–4; see also T. 12. Brave drove Henry's car until it ran out of gas, at which point Schmidt came to pick Brave up. Ex. 1 at 12:50; T. 13.

Brave told Special Agent Rowland that she has noticed things on other occasions, such as J.M.H. hiding from Henry at bath times or J.M.H. waking up in the middle of the night crying,

3

but Henry told her that J.M.H. woke up at times because of leg cramps from riding her bike too often. Ex. 1 at 5:41, 17:47, 18:39; Ex. 5 at 2. Brave also reported that she saw pictures of Henry's girls on his phone, including one with J.K.H. lying on a fold-out couch in her underwear with her head turned away. Ex. 1 at 25:30, 26:50; Ex. 5 at 5; see also T. 13. Special Agent Rowland took possession from Brave of Henry's phone, which was already turned off, as potential evidence. T. 13. Brave told Special Agent Rowland what Henry's password to his phone was, but Special Agent Rowland testified that she did not look at the phone prior to procurement of a search warrant. T. 13–14, 34. A search warrant for the cell phone was later obtained, and Special Agent Rowland searched the phone on October 23, 2014. T. 13.

After speaking with Brave, Special Agent Rowland attempted to locate Henry. T. 14. Brave had told Special Agent Rowland that Henry worked at TECRO, a business located in Rosebud, South Dakota, so Special Agent Rowland and Special Agent Mark Kettell from the Rosebud Sioux Tribe Law Enforcement Services ("Special Agent Kettell") went to TECRO to see if Henry was working. T. 14–15. Special Agent Rowland asked the receptionist if Henry was there, and the receptionist went into a back room and came back out with Henry. T. 14. Special Agent Rowland did not see any other people in the building other than the receptionist and Henry and testified that Henry "invited [the agents] back to his office." T. 14–15, 28–29. Henry's office was approximately ten feet by eight feet with a single window and had two chairs, one behind a desk and another in front of the desk. T. 14–16. Henry retrieved another chair from a different room so that both Special Agent Rowland and Special Agent Kettell could sit. T. 14. Henry closed the door and sat in the chair behind his desk. T. 14–15, 29, 42.

4

Special Agent Rowland testified that she informed Henry that there had been allegations made against him for child sexual abuse, that "he was not under arrest, and that it was voluntary to speak with [the agents]." T. 14, 16, 29–30, 42. Special Agent Rowland further testified that she asked Henry "if he was still willing to speak with [the agents] and he said that he was." T. 15–16. At that point, Special Agent Rowland started her audio recording device.[4] T. 16, 30. During the approximately thirty-seven minute interview, Henry denied the allegations, see, e.g., Ex. 2 at 15:21, 17:01, 21:15, 34:35, and essentially told the agents that Brave concocted the entire story, see, e.g., Ex. 2 at 9:52, 17:27, 27:56. Special Agent Rowland employed deceptive tactics when questioning Henry after he denied the allegations, including falsely telling Henry that the alleged victim disclosed abuse. T. 32, 44; Ex. 2 at 15:03, 17:05. Special Agent Rowland also told Henry that pictures on his phone bordered on child pornography and were "inappropriate." T. 32–33; Ex. 2 at 19:02, 19:58. Those tactics, however, were unsuccessful, and Henry continued to deny the allegations. T. 44. Special Agent Rowland concluded the interview because Henry requested to take a polygraph examination. T. 43; Ex. 2 at 26:07. Henry was not arrested after Special Agent Rowland concluded the interview. T. 43, 45.

Special Agent Rowland testified that Henry did not express any confusion or have any questions after she informed him that the interview was voluntary. T. 40. According to Special Agent Rowland, Henry did not appear to have any mental deficiencies, was not intoxicated or impaired by alcohol or drugs during the interview, and spoke intelligently and appropriately when responding to questions. Doc. 46; see also Ex. 2. Special Agent Rowland also testified

---

[4] Special Agent Rowland testified that perhaps ten or fifteen seconds of her interview with Henry were not captured on that audio recording. T. 41.

5

that Henry was not handcuffed or otherwise restrained,[5] never expressed a desire to end the interview, and was free to move about the office during the interview. T. 40, 42–43.

Thereafter, Special Agent Rowland prepared an affidavit of probable cause to obtain a search warrant for Henry's phone. T. 22; Ex. 9. In preparing that affidavit, Special Agent Rowland contacted Brave again to clarify what Brave meant in her previous interview when she described the photos on Henry's phone as "creepy."[6] T. 23, 35–36. Special Agent Rowland testified that Brave "stated that she found the pictures on [Henry's] phone inappropriate." T. 23, 35–36, 47. In her affidavit of probable cause, Special Agent Rowland attested that "Brave described the pictures [on Henry's cell phone] as being inappropriate and creepy." Ex. 9 at ¶ 11. A search warrant was later obtained and was executed on October 23, 2014. T. 24. Three photos were found on the phone, including one photo of J.K.H. with her head facing the other direction, lying on her stomach on a fold-out couch, with just a diaper on. T. 26; Ex. 12.

## II. DISCUSSION

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." "In the absence of an objection, the district court is not required 'to give any more consideration to the magistrate's report than the court considers appropriate.'" United States v. Simeon, 115 F. Supp. 3d 981, 993 (N.D. Iowa

---

[5] Special Agent Rowland testified that she never physically touched Henry, not even for a handshake. T. 42.

[6] It is not clear from the record when Special Agent Rowland re-contacted Brave.

2015) (quoting Thomas v. Arn, 474 U.S. 140, 150 (1985)). Henry objects to Judge Moreno's determination that Henry was not in custody, that he made voluntarily statements, and that the evidence from his cell phone was lawfully seized. Doc. 53. There is essentially no difference between these arguments and the arguments that Judge Moreno rejected when considering Henry's motion to suppress. See Docs. 28, 53. This Court has conducted a de novo review of the Report and Recommendation and agrees in all respects with Judge Moreno's reasoning. Nonetheless, this Court will explain why Henry's objections are overruled.

## A. **Miranda's Custody Requirement**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. In Miranda v. Arizona, the Supreme Court of the United States declared that the government cannot use statements of the defendant that derive "from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). The Supreme Court explained that custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Thus, there are two predicates that need to be satisfied in order for Miranda warnings to apply: (1) the suspect must be in custody; and (2) there must be an interrogation. See id. If both custody and interrogation exist, suspects are constitutionally entitled to be given Miranda warnings. See id. at 444–45. Because Henry was subject to interrogation, only the custodial requirement is at issue in this case.

7

Whether a suspect is in custody turns on an objective, two-part inquiry: "first, what were the circumstances surrounding the interrogation; and, second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." J.D.B. v. North Carolina, 564 U.S. 261, 270 (2011) (quoting Thompson v. Keohane, 516 U.S. 99, 112 (1995)); see also United States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011). "Because the custody determination focuses on how a reasonable person in the suspect's position would have felt, the 'subjective views harbored by either the interrogating officers or the person being questioned are irrelevant.'" United States v. Bear, No. 3:14-CR-30122-RAL, 2015 WL 1969413, at *4 (D.S.D. May 1, 2015) (quoting J.D.B., 564 U.S. at 271).

"[R]elevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation." United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990). In Griffin, the Eighth Circuit set forth several common "indicia of custody" considerations relating to "police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation." Id. at 1349. Those factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. The Griffin indicia factors, while instructive, are not dispositive or exhaustive. Id.; see also Thomas, 664 F.3d at 222; United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005);

8

United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004). They are merely one means of analyzing whether the suspect had a reasonable subjective belief that his "freedom of action [was] curtailed to a degree associated with formal arrest" and "whether that belief [was] objectively reasonable under the circumstances." Griffin, 922 F.2d at 1349. The Eighth Circuit stated in Griffin that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." Id. (internal citation and quotation marks omitted).

The Eighth Circuit recently applied this custody framework in United States v. Laurita, No. 15-1137, 2016 WL 2342965 (8th Cir. May 4, 2016). In that case, Laurita was questioned about his alleged involvement with child pornography at his place of employment by an FBI agent and an FBI computer expert. Id at *1. The agent and computer expert were not wearing clothing that associated them with the FBI, and without disclosing their intentions, the agent asked a security employee if he could speak with Laurita. Id. The agent and computer expert were directed to re-enter the building through the back entrance where they waited for Laurita in a small conference room with four chairs, one door, and a small window. Id. After Laurita finished a work call, his supervisor informed him that Laurita needed to go with the supervisor, and the supervisor escorted Laurita to the "closed door" human resources area where the agent and computer expert were waiting. Id. Laurita sat in a chair between the agent and computer expert, and the door to the conference room was closed during the twenty-minute interview. Id. at *1–2. The agent spoke in a conversational manner and informed Laurita that a search warrant had been executed in Laurita's grandmother's home relating to child pornography. Id. The

9

agent did not expressly tell Laurita that his participation in the interview was voluntary or that Laurita was under arrest. Id. Laurita made incriminating statements during the interview, but he was not arrested at the conclusion of the interview. Id. at *2.

The Eighth Circuit reversed the district court's finding that Laurita was in custody for multiple reasons. Id. at *3–7. First, the Eighth Circuit stated that the district court placed too much weight on the first Griffin factor because Laurita was not told that participation in the interview was voluntary. Id. at *3 (noting the primary inquiry is whether a suspect was restrained as though he were under formal arrest and that informing a suspect that his participation in questioning is voluntary does not support the "opposite inference"—that not being told one is free to leave is a strong indication of custody). Next, the Eighth Circuit found that Laurita's movement was not significantly constrained and that he voluntarily spoke with the agent. Id. at *4. Finding that none of the final three Griffin indicia factors (the aggravating factors) were present, the Eighth Circuit noted that the interview was brief, not police dominated, and was conducted in an area where Laurita was comfortable and less threatened, and that no arrest occurred. Id. at *6–7 (stating that because the subject matter of the interview was "sensitive . . . it was wise of [the agent] to close the [interview room] door"). Laurita was not particularly susceptible to deception because he was in his thirties, held an associate degree and professional job, and had prior experience being interviewed by law enforcement. Id. at *5. Finally, the Eighth Circuit found that no impermissible or strong-arm tactics were used because the agent's questions regarding young children around Laurita "expressly related to a legitimate concern for the safety of two young children." Id. at *5.

10

Similar to the Eighth Circuit's reasoning in Laurita, Henry was not in custody during his interview with Special Agent Rowland and Special Agent Kettell. Henry was questioned for a relatively short period of time regarding sensitive matters at his employment while seated in his chair behind his desk, and Henry closed the door himself after retrieving an additional chair for the agents. Henry was not handcuffed or otherwise restrained and responded to questions throughout the interview, denying allegations until the interview ended after he requested a polygraph examination. Like Laurita, the office environment was not police dominated, and Special Agent Rowland's deceptive statements were largely related to "legitimate concern for safety of [Henry's] two young children." 2016 WL 2342965, at *5. Additionally, Henry was not arrested at the conclusion of the interview and nothing in the record indicates that he would be susceptible to deception; to the contrary, Henry was thirty-eight at the time of the interview, Ex. 2 at 5:32, and worked a professional job.

Although Special Agent Rowland did not advise Henry that he could refuse to talk to her, or that he was free to leave and could stop the interview at any time, T. 30, 42–43, 45, he was told that "he was not under arrest, and that it was voluntary to speak with [the agents]," T. 14, 16, 29–30, 42; see Laurita 2016 WL 2342965, at *1–2 (finding defendant not in custody where agent did not expressly tell defendant that interview was voluntary or that he was not under arrest). Similarly, the fact that the audio recording was turned on after Special Agent Rowland told Henry that he was not under arrest and that it was voluntary to speak with the agents does not transform the interview to a custodial one. T. 32. Judge Moreno found Special Agent Rowland's testimony to be credible, and this Court finds no reason to reject that credibility

finding.[7] Doc. 51 at 14. A reasonable person in Henry's position would not have felt that he or she was unable to terminate the interview or leave the office. Therefore, Henry's objection to the Report and Recommendation regarding the custodial determination is overruled. See Brave Heart, 397 F.3d at 1039 (finding defendant was not in custody where law enforcement officer told defendant at the beginning of the interview that defendant's presence was voluntary and stating that "no governing precedent of the Supreme Court or this court has yet held that a person was in custody after being 'clearly advised of his freedom to leave or terminate questioning'" (quoting Czichray, 378 F.3d at 826)); see also Bear, 2015 WL 1969413, at *4–6 (finding that although officer never informed defendant that he was free to leave and arrested defendant at the end of the interview, defendant was not in custody because he was briefly questioned in his hotel room and the defendant was not constrained and free to move around room).

**B. Voluntariness of Statements**

The Fifth Amendment privilege against self-incrimination protects criminal defendants from being compelled by the government to incriminate themselves. Miranda, 384 U.S. at 467. A voluntary statement or confession may be used against a defendant in court, but an involuntary statement or confession may not. Schneckloth v. Bustamonte, 412 U.S. 218, 226–27 (1973). A

---

[7] Henry also argues that "Agent Kettell's testimony was not fully consistent with [Agent] Rowland's." Doc. 53 at 2. Special Agent Kettell, who did not prepare a report after the interview or actively question Henry, testified that Henry was either told "that he could speak with [the agents] if he wanted to" or that "he doesn't have to" speak with the agents. T. 50–51; Ex. 2. According to Special Agent Kettell, although he could not recall the exact words, the "gist of the conversation" entailed that the conversation would be "voluntary." T. 51–54. Special Agent Kettell's testimony thus, while not identical to that of Special Agent Rowland's, supports that Special Agent Rowland conveyed to Henry at the start of the conversation that his participation was voluntary.

statement is voluntary if it is the product of an "essentially free and unconstrained choice by its maker." Id. at 225–26. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (quoting United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004)). A court must consider the totality of the circumstances to determine whether a statement is voluntary. Arizona v. Fulminante, 499 U.S. 279, 285–86 (1991). The Court focuses on the conduct of the agents and the characteristics of the suspect, including the extent of police coercion, the details of the interrogation, the length of the interrogation, and the suspect's capacity to resist pressure to confess. See LeBrun, 363 F.3d at 724–26; United States v. Daniels, 775 F.3d 1001, 1004–05 (8th Cir. 2014), cert. denied, 136 S. Ct. 191 (U.S. Oct. 5, 2015) (No. 15-5133); see also Schneckloth, 412 U.S. at 226; Wilson v. Lawrence Cty., 260 F.3d 946, 952 (8th Cir. 2001). In an effort to determine the defendant's ability to resist pressure, courts take into account the person's age, years of formal education, physical and mental condition, intelligence level, and prior experience with law enforcement. Daniels, 775 F.3d at 1005; Wilson, 260 F.3d at 952; United States v. Gallardo-Marquez, 253 F.3d 1121, 1123–24 (8th Cir. 2001); see also LeBrun, 363 F.3d at 726 ("[O]ne of the key concerns in judging whether confessions were involuntary . . . [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne."). The primary issue is "whether or not the authorities overbore the defendant's will and critically impaired his capacity for self-determination." LeBrun, 363 F.3d at 725. "The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements

13

were voluntary." Boslau, 632 F.3d at 429 (citation omitted); see also United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001).

This Court agrees with Judge Moreno's conclusion that Henry's Fifth Amendment rights were not violated because he voluntarily and willingly spoke with and participated in the interview with the agents. Doc. 51 at 15–16. Special Agent Rowland testified that Henry did not express any confusion, asked no questions about the voluntary status of the interview, and did not present any signs of mental deficiency or intoxication. Instead, Special Agent Rowland testified, and this Court observed after listening to the audio recording of the interview, that Henry spoke intelligently and responded appropriately to the questions asked of him. As stated above, Henry was in his late thirties, held a professional job, and the relatively short interview (approximately thirty-seven minutes) did not reveal that Henry lacked the capacity to resist pressure to confess because Henry repeatedly denied the accusations. The government has met its burden that Henry's statements were made voluntarily and were not extracted by threats, violence, or express or implied promises sufficient to overbear his will or critically impair his capacity for self-determination. Thus, Henry's voluntariness objections are overruled. See Daniels, 775 F.3d at 1005 (concluding that defendant voluntarily gave statements to law enforcement officers because he answered questions intelligently and coherently in a way that indicated he was not compelled against his will, and he did not indicate that he was confused, drowsy, or under the influence).

### C. Evidence Obtained from Cell Phone

Finally, Henry argues that the evidence obtained from his cell phone should be suppressed under the Fourth Amendment because Special Agent Rowland's affidavit for a search

14

warrant contained false statements—namely her use of the word "inappropriate" in paragraph eleven—and requests a hearing under Franks v. Delaware, 436 U.S. 154 (1978). Henry maintains that when the word "inappropriate" is extracted, the affidavit would not have established probable cause for a search warrant of the cell phone. The Eighth Circuit has elaborated on the analysis a district court must consider under Franks as follows:

> A search warrant must be voided and the fruits of the search suppressed if a defendant proves by a preponderance of the evidence that (1) a law enforcement officer knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause. This rationale also applies to information that the affiant deliberately or with reckless disregard for the truth omits from the affidavit such that the affidavit is misleading and insufficient to establish probable cause had the omitted information been included. To show reckless disregard for the truth, [courts] do not look simply at whether a statement included in the affidavit was true; rather, [courts] ask whether, when looking at all the evidence available to the officer, the officer must have entertained serious doubts as to the truth of his [or her] statements or had obvious reasons to doubt the accuracy of the information he [or she] reported. An affidavit submitted in support of a warrant carries a presumption of validity. A showing of negligence or innocent mistake is not enough to establish a Franks violation.

United States v. Neal, 528 F.3d 1069, 1072–73 (8th Cir. 2008) (first, second, and fifth alteration added) (internal citations, quotation marks, and quotations omitted); see also United States v. Conant, 799 F.3d 1195, 1199–1201 (8th Cir. 2015); United States v. McIntyre, 646 F.3d 1107, 1114 (8th Cir. 2011). This type of showing is not easily met because a defendant must make "a substantial preliminary showing" under the two-prong test. Franks, 438 U.S. at 171; United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002) (quoting United States v. Milton, 153 F.3d 891, 896 (8th Cir.1998)). Additionally, the defendant's "attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." Franks, 438 U.S. at 171.

In this case, Henry is not entitled to a Franks hearing because he has not made a substantial preliminary showing that Special Agent Rowland acted knowingly and intentionally, or with reckless disregard for the truth in obtaining the search warrant of the cell phone. Special Agent Rowland testified that Brave initially used the word "creepy" to describe the photos, but later-described the photos to be "inappropriate." Having determined Special Agent Rowland's testimony to be credible, Judge Moreno rightly determined that the statements "were not false at all, but rather, completely accurate." Doc. 51 at 14. See United States v. Finley, 612 F.3d 998, 1002–03 (8th Cir. 2010) (concluding that no Franks violation occurred because defendant did not make a showing of deliberate or reckless falsehood, relying, in part, on magistrate judge's finding and observation of agents' testimony). Therefore, Henry's remaining objection to the Report and Recommendation is overruled.

## V. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Henry's Motion to Suppress, Doc. 28, is denied. It is further

ORDERED that the Report and Recommendation, Doc. 51, is adopted and that the objections to that Report and Recommendation, Doc. 53, are overruled.

DATED this 13ᵗʰ day of June, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

16